# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| FREDERICK HARRIS, *et al.*, | ) | Case No. 1:22-cv-00247 |
| | ) | |
| Appellants, | ) | Appeal from Bankr. Ct. |
| | ) | No. 18-16598 |
| v. | ) | |
| | ) | Judge J. Philip Calabrese |
| SYNOVUS BANK, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

## <u>OPINION AND ORDER</u>

In this bankruptcy appeal, Dr. Frederick Harris and his wife Bernice Harris appeal the bankruptcy court's January 2022 judgment overruling their objection to Appellee Synovus Bank's general unsecured claim for $122,338.11.  As the Debtors in the bankruptcy proceeding, Appellants argue that the court improperly failed to: (1) conclude that Synovus committed fraudulent inducement; (2) conclude that Synovus engaged in predatory lending; (3) conclude that Synovus engaged in solicitation in violation of Ohio law; (4) find that Synovus breached its fiduciary duty as an insurance agent; and (5) conclude that the claims calculation was illegal or barred by the law of estoppel or election of remedies.  Appellants also argue that the bankruptcy court abused its discretion when it refused to qualify Appellants' witness Lonnie Sloan as an expert.  On each issue, the Court **AFFIRMS** the judgment of the bankruptcy court.  The Court **DENIES** Appellants' request for oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are largely undisputed.  Dr. Harris is a primary care physician at the Cleveland Clinic, where he has practiced medicine since 2005.  (ECF No. 1-1, PageID #47; *Harris* ECF No. 242, at 5.[1])  He graduated from Case Western Reserve School of Medicine in 1985.  (*Id.*)  In 2013, Dr. Harris earned a salary of approximately $390,000 per year.  (*Id.*)  However, by 2014 he was struggling financially and was behind on his mortgage.  (*Id.*)  Dr. Harris maintained a life insurance policy for $5,000,000.00 through his employer.  (*Id.*; ECF No. 15, PageID #182.)

### A.    Legacy Point Capital

In 2014, Dr. Harris met Byron Holley, who owned and managed Legacy Point Capital, an investment bank and advisory firm.  (ECF No. 1-1, PageID #47; *Harris* ECF No. 242, at 5.)  John Loudon co-owned and co-managed Legacy Point.  (*Id.*)  Dr. Harris was interested in Legacy Point's premium financed life insurance product as a retirement tool.  (*Id.*)  Specifically, Dr. Harris was interested in the tax advantages he would enjoy if an irrevocable life insurance trust held the policy.  (*Id.*)  If he financed the insurance premiums, Dr. Harris would pay very little up front on the policy.  (*Id.*)

Also, because Dr. Harris was himself a licensed insurance agent, Legacy Point promised him a commission if he recruited other physicians to purchase the product.  (*Id.*)  Theoretically, the commission would cover the cost of Dr. Harris's policy.  (*Id.*)

---

[1] For citation purposes, the Court refers to the docket in the bankruptcy case, *In re Harris*, 18-bk-16598 (Bankr. N.D. Ohio), as *Harris*, and the docket on this appeal without specific designation.

Legacy Point identified Global One Financial, Inc., Appellee's predecessor, as a potential lender to finance the policy.  (*Id.*)  Legacy Point primarily worked with Global One's marketing arm, Global Financial Distributors, to negotiate a loan to purchase Dr. Harris's premium-financed life insurance policy.  (ECF No. 1-1, PageID #47–48; *Harris* ECF No. 242, at 5–6.)

Financing the policy had other advantages.  First, the outstanding principal the borrower owed on the loan would never exceed the cash surrender value of the insurance policy.  (*Id.*)  Even in the event of default, the lender could use the cash surrender value of the policy to repay the outstanding principal.  (*Id.*)  For Global One, this meant little risk of losing any principal on the loan.  (*Id.*)  However, in the event of default the borrower might still owe prepayment penalties, interest, and fees associated with early termination of the loan.  (*Id.*)  Dr. Harris testified that Legacy Point assured him that Global One would waive any such penalties, interest, and fees in consideration for Dr. Harris's efforts in referring other physicians to purchase similar insurance.  (*Id.*; *Harris* ECF No. 277, at 72 & 194.)  Also, Legacy Point agreed to share the commission earned on the sale of the life insurance policy with Global Financial Distributors.  (ECF No. 1-1, PageID #49 & 75; *Harris* ECF No. 242, at 7 & 33.)

In June 2014, Appellee proposed making the loan to Dr. Harris's trust.  (*Id.*)  This loan required a personal guaranty from Dr. Harris.  (*Id.*)  Dr. Harris rejected the proposal because he did not want to sign a personal guaranty.  (*Id.*)  Global Financial

Distributors understood that it was important to Dr. Harris that he not sign a personal guaranty. (*Id.*)

Next, Dr. Harris and Legacy Point proposed that Global One make the loan to an existing corporation that Dr. Harris controlled. (*Id.*) Global Financial Distributors represented that making the loan to a corporation would not require a personal guaranty from Dr. Harris. (*Id.*) However, this loan proved unworkable. (*Id.*) Legacy Point proposed that Dr. Harris create a new corporation to take out the loan. (*Id.*) Dr. Harris formed Galaxy Investors, Inc. for this purpose. (*Id.*) However, in November 2014, Lincoln Financial Group, the entity issuing the life insurance policy, declined to issue the policy under this arrangement. (*Id.*)

### B.    The Note and the Personal Guaranty

On November 13, 2014, Global Financial Distributors sent Legacy Point a draft personal guaranty that Dr. Harris would need to sign to satisfy Lincoln Financial. (ECF No. 1-1, PageID #50; *Harris* ECF No. 242, at 8.) Like the first iteration of the deal, the life insurance trust would be the borrower under this arrangement. (*Id.*) On November 24, 2014, Lonnie Sloan, the trustee for Mr. Harris's irrevocable trust, signed an underwriting form that detailed Dr. Harris's assets. (*Id.*) That form listed one of Dr. Harris's assets as $7,500,000 in "business value." (*Id.*) According to Dr. Harris, this information was based on a letter from Dr. Harris's accountant, Ali Mohammadpour. (*Harris* ECF No. 277, at 88–90; ECF No. 15, PageID #183.) On November 26, 2014, Global Financial Distributors sent Legacy Point thirteen documents, including the promissory note which Sloan signed as trustee and the personal guaranty Dr. Harris was to sign. (ECF No. 1-1, PageID #50; *Harris* ECF

No. 242, at 8.)  Legacy Point did not explain the guaranty to Dr. Harris or bring it to his attention.  (*Id.*)

On December 1, 2014, Dr. Harris signed the personal guaranty.  (*Id.*; *Harris* ECF No. 62-2, at 47.)  The bankruptcy court could "only speculate as to exactly how Dr. Harris came to sign the personal guaranty on December 1, 2014, after having repeatedly expressed his unwillingness to do so."  (*Id.*)  Dr. Harris explained that the personal guaranty "slipped in at signing," and he relied on Global Financial Distributors' understanding that he did not want to sign a personal guaranty.  (ECF No. 21, PageID #257–58.)  Also, he testified that on the day of signing, he felt rushed because he attended to several patients.  (*Harris* ECF No. 277, at 134.)

The next day, Global Financial Distributors sent the loan documents to Lincoln Financial and finalized the life insurance policy.  (ECF No. 1-1, PageID #51; *Harris* ECF No. 242, at 9.)  The promissory note, security agreement, and the personal guaranty did not include a waiver of prepayment penalties, interests, or fees, and the note expressly rejects any oral representations to the contrary.  (ECF No. 1-1, PageID #48–49; *Harris* ECF No. 242, at 6–7; *Harris* ECF No. 62-2, at 31.)

Under the terms of the loan, Global One agreed to finance annual insurance premiums of approximately $341,198 per year as advances for each of the first seven years.  (*Harris*, ECF No. 62-2, at 27.)  The trust would make interest payments during that period.  (*Id.*)  The note provides the following:  Dr. Harris's trust "agrees that any Prepayments made during the first five (5) years after the date hereof will cause damages in the form of collateral and servicing costs."  (*Id.* at 28.)  The intention of

5

the loan was that the trust would only pay on the interest, so any payment on the principal was considered a prepayment causing damages.  (*Id.*)  The note provided those damages would be estimated at a rate of 3% for prepayment made in the third year, which is when the trust defaulted and Global One surrendered the policy.  (*Id.*; ECF No. 1-1, PageID #60; *Harris* ECF No. 242, at 18.)

Also under the note, the loan would accrue additional interest from the date of default until the date of repayment.  (*Harris* ECF No. 62-2, at 27.)  In the event of default, Global one could surrender the insurance contract to the insurance company in exchange for the cash surrender value of the policy and "take all other [lawful] action" conducive or incidental to the trust's default.  (*Id.* at 30.)  Finally, the note provided for attorneys' fees for the cost of collecting under the loan.  (*Id.* at 31.)  Appellee incurred $10,151.51 in attorneys' fees related to the trust's default.  (ECF No. 1-1, PageID #60; *Harris* ECF No. 242, at 18.)

Although the Court does not know the exact amount of the insurance commission earned on this transaction, Lincoln Financial would have paid a total commission of approximately $30,000 on the insurance policy.  (ECF No. 1-1, PageID #51; *Harris* ECF No. 242, at 9.)  By agreement between Global Financial Distributors and Legacy Point, Global Financial Distributors would receive ten percent or approximately $3,000 for assisting Legacy Point in applying for the loan with Global One.  (*Id.*)  Dr. Harris was unaware of this arrangement until after the trust defaulted on the loan.  (*Harris* ECF No. 277, at 101 & 103; ECF No. 15, PageID #195.)

### C. Default

The trust timely made the interest payments and kept the loan in good standing for two years. (ECF No. 1-1, PageID #51; *Harris* ECF No. 242, at 9.) However, Dr. Harris continued to struggle financially. (*Id.*) By 2017, his home was in foreclosure. (ECF No. 1-1, PageID #52; *Harris* ECF No. 242, at 10.) On February 1, 2017, the trust did not make the monthly interest payment of $3,733.05. (*Id.*) On February 14, 2017, Global One notified Dr. Harris and Sloan that the trust was in default on the note. (*Id.*) Global One gave the trust until March 1, 2017 to cure the default. It did not. (*Id.*) Dr. Harris reached out to Global One in February 2017 to discuss options to make the interest payments more affordable. (ECF No. 15, PageID #200; *Harris* ECF No. 277, at 138–40.) Global One discussed potential options via email, but did not follow through with them. (*Id.*)

On May 8, 2017, Global One notified Dr. Harris and Sloan that it surrendered the life insurance policy and applied the cash surrender value to the loan principal. (ECF No. 1-1, PageID #52; *Harris* ECF No. 242, at 10.) As of May 8, 2017, the trust owed Global One $101,265.15 in prepayment fees and penalties. (*Id.*)

### D. Debtors' Chapter 13 Bankruptcy and Procedural History

On July 13, 2017, Synovus filed suit against Dr. Harris and Sloan in the United States District Court for the Northern District of Georgia to collect the amount owed. *Synovus Bank v. Sloan*, No. 1:17-cv-02635-AT (N.D. Ga.). Synovus sued Sloan as a trustee. (*Id.*) Synovus alleged that it made a loan to the trust for the purchase of life insurance, the trust defaulted on the loan in February 2017, and Dr. Harris had personally guaranteed the loan. (*Id.*)

7

On November 18, 2018, Debtors filed for Chapter 13 bankruptcy in the Northern District of Ohio, effectively staying the federal lawsuit in Georgia.  (ECF No. 1-1, PageID #45; *Harris* ECF No. 242, at 22.)  Synovus timely objected to the Chapter 13 plan seeking to recover the $122,338.11 that allegedly due under Dr. Harris's personal guarantee on the loan from Global One to the trust.  (*Harris* ECF No.  39.)  On April 30, 2019, Debtors objected to Synovus's claim, arguing that it was "highly speculative, improper, and premature."  (*Harris* ECF No. 55, at 1.)  Debtors objected on the grounds that:  (1) the claim is improper because it is for unmatured interest; (2) Global One procured the loan by fraudulent inducement; and (3) the loan is invalid because Global One lacked a premium finance license in Ohio.  (*Harris* ECF No. 77.)  Further, Debtors argued that Synovus lacked standing to bring the claim.  (*Id.* at 3.)  During the bankruptcy court proceedings, the parties orally stipulated that Synovus has standing to assert Global One's claim as successor in interest.  (*Harris* ECF No. 277, at 14.)  The parties briefed the remaining issues, and the bankruptcy court held an evidentiary hearing on September 30 and October 1, 2021.  (*Harris* ECF No. 77; *Harris* ECF No. 81; *Harris* ECF No. 277; *Harris* ECF No. 278.)

During the hearing, the bankruptcy court heard testimony from Dr. Harris, Sloan, and Jonathan D. Rosen, the founder of Global One and then chief executive officer of Synovus's specialty finance division.  (ECF No. 1-1, PageID #45; *Harris*, ECF No. 242, at 3.)  The bankruptcy court admitted several exhibits from both parties, but excluded Debtors' Exhibit P, Sloan's expert report.  (*Id.*)  The bankruptcy

court also struck Sloan's expert testimony on behalf of Debtors on the ground that it was not relevant, but allowed Synovus to cross-examine him concerning his role as trustee.  (*Harris* ECF No. 277, at 260.)

On January 23, 2022, the bankruptcy court entered its memorandum opinion denying Dr. Harris's objection in full.  (ECF No. 1-1, PageID #43; *Harris* ECF No. 242.)  On February 4, 2022, Dr. Harris filed a notice of appeal.  (ECF No. 1.)

## ORAL ARGUMENT

Appellants request oral argument on their appeal.  (ECF No. 15, PageID #163.) Under Bankruptcy Rule 8019, the Court must allow oral argument in every case unless, upon examination of the briefs and the record, the Court determines that one of three exceptions applies:   (1) "the appeal is frivolous; (2) the dispositive issue or issues have been authoritatively decided; or (3) the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."  Fed. R. Bankr. P. 8019.  Appellee urges the Court not to set oral argument because the briefs on appeal, and the voluminous record before the bankruptcy court, adequately present the relevant facts and legal argument.  (ECF No. 17, PageID #216.)  Further, Appellee argues that the appeal is frivolous.  (*Id.*, PageID #216–17.)

The Court agrees that the parties' briefs on appeal and the record before the bankruptcy court adequately present the facts and legal arguments at issue.  In the bankruptcy court, the parties briefed Debtors' objection to Synovus's claim and request for an evidentiary hearing.  (*Harris* ECF No. 55; *Harris* ECF No. 62.)  Also,

the parties filed supplemental briefing on the objection and exchanged discovery. (*Harris* ECF No. 77; *Harris* ECF No. 81; *Harris* ECF No. 87; *Harris* ECF No. 97; *Harris* ECF No. 107.)  The bankruptcy court held a two-day evidentiary hearing, and the transcripts of that hearing are available to the Court.  (*Harris* ECF No. 277; *Harris*, ECF No. 278.) Therefore, the parties' briefs and the voluminous record before the bankruptcy court support a finding that oral argument will not aid the Court in deciding this appeal.  For these reasons, the Court **DENIES** Appellants' request for oral argument.

## STANDARD OF REVIEW

The Court reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo. *WesBanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs.)*, 106 F.3d 1255, 1259 (6th Cir. 1997).   The Court reviews for abuse of discretion a bankruptcy court's exclusion of an expert witness's testimony.  *New Prods. Corp. v. Tibble (In re Modern Plastics Corp.)*, 732 F. App'x. 379, 386 (6th Cir. 2018).  An abuse of discretion occurs if "the [bankruptcy] court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012).

## ANALYSIS

On March 4, 2022, Appellants filed their statement of issues on appeal with the bankruptcy court.  (*Harris* ECF No. 260.)  In that filing, they identify five issues concerning their predatory lending and breach of fiduciary duty arguments, fraud,

the exclusion of Sloan's expert witness testimony, and assert that the bankruptcy court's ruling was arbitrary and capricious and against the weight of the evidence. (*Id.* at 1.)

Appellants' brief on appeal differs from this filing. They argue that the bankruptcy court erred or otherwise abused its discretion by failing to: (1) conclude that Appellee committed fraudulent inducement; (2) conclude that Appellee engaged in predatory lending; (3) conclude that Appellee engaged in unlawful solicitation; (4) find that Appellee breached a fiduciary duty owed to Appellants; (5) find that Appellee's claim calculation was illegal, barred by the election of remedies, and should be estopped. (ECF No. 15, PageID #165.) Also, Appellants argue that the bankruptcy court abused its discretion by striking Sloan's expert witness testimony. (*Id.*)

Under Rule 8009(a) of the Federal Rules of Bankruptcy Procedure, Appellants must identify the issues on which they base their appeal before the bankruptcy court. Appellants do not necessarily waive an issue on appeal by omitting the issue from their statement of issues on appeal where the parties thoroughly brief the issue and the Court's consideration of the issue does not prejudice Appellee. *See Sequatchie Mountain Creditors v. Lile*, 585 B.R. 426, 432 (N.D. Ohio 2018) (citation omitted).

## I.    Sloan's Expert Testimony

The bankruptcy court struck Sloan's expert testimony. (ECF No. 1-1, PageID #53; *Harris* ECF No. 242, at 11.) Appellants proffered Sloan's expert testimony to support their allegation that Appellee lacked sufficient internal controls and did not substantiate Dr. Harris's financial information contained in the

underwriting form.  (ECF No. 277, at 253–54.)  Appellants' attorney represented that this testimony supported their claim that Appellee engaged in predatory lending.  (*Id.* at 254.)  For this reason, the bankruptcy court determined that Sloan's expert testimony concerning Dr. Harris's creditworthiness for the loan was not helpful to the finder of fact because it was clear without expert testimony that Dr. Harris was not worth $7.5 million, as the underwriting form stated, and could not afford the interest payments under the loan.  (*Id.* at 258–59.)  Further, the bankruptcy court ruled that the testimony was not relevant because Appellants failed to identify how a predatory lending allegation would affect Appellee's claim in the bankruptcy proceeding.  (*Id.* at 259.)

### I.A.    Rule 702

Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  At bottom, this gatekeeping function ensures that expert evidence rests on a reliable foundation and is relevant to the task at hand.  *Daubert*, 509 U.S. at 589, 597.  Additionally, the Court must find that:  (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The Court's gatekeeping role applies to all

testimony based on technical or specialized knowledge, not just scientific evidence. *Kumho Tire Co.*, 526 U.S. at 147.

### I.B.    Basis for Exclusion

Appellants argue that the bankruptcy court "erred or abused its discretion by failing to qualify Appellants' expert." (ECF No. 15, PageID #202.)  The Court reviews a bankruptcy court's exclusion of an expert witness for abuse of discretion, not clear error.  *In re Modern Plastics*, 732 F. App'x. at 386.

Appellants argue that Sloan's testimony as an expert, rather than as a fact witness in his capacity as a trustee, satisfies Rule 702 because he had no "input or knowledge into the financials, business evaluation, [or] the net worth of Dr. Harris during the pendency of this deal in 2014." (ECF No. 15, PageID #202.)   Further, Appellants point to the fact that Sloan was not Dr. Harris's certified public accountant for this deal, apparently arguing that the bankruptcy court erroneously found that he was and used that finding to support excluding his expert testimony. (*Id.*)

But the record reflects that the bankruptcy court excluded Sloan's testimony not because he was Dr. Harris's accountant, but because his testimony would not be helpful in its role as the trier of fact, a proper consideration under Rule 702.  (*Harris*, ECF No. 277, at 255–56 & 260.)  Also, the bankruptcy court excluded Sloan's expert testimony because it was not relevant to the claim or objection at issue.  (*Id.* at 259.) The bankruptcy court properly considered the fit of Sloan's expert testimony— another proper consideration under Rule 702.  Whether Sloan's expert opinion or other evidence would be helpful in an adversary proceeding or some other lawsuit

presents a separate question. But on the question of whether his testimony was relevant to Appellants' claim objection, the bankruptcy court did not abuse its discretion by excluding it.

### I.C.   Partisanship

Appellee argues Sloan's testimony was also inadmissible because of the danger of "extreme partisanship" presented by Sloan's status as trustee of the ILIT and as Dr. Harris's longtime friend. (ECF No. 17, Page ID #230.) According to Appellee, this was one of the reasons the bankruptcy court concluded it was not appropriate to qualify Sloan as an expert. (*Id*. at 231.) But the record does not bear out that argument. When Sloan invoked his Fifth Amendment right in response to examination as a fact witness, the bankruptcy court made one comment to the effect that it "might be another reason for not wanting to go down [the expert witness] route." (ECF No. 277, at 259.) Then, the bankruptcy court explained how Sloan's testimony would be unhelpful to the trier of fact and that, as a legal matter, "for the purposes of this hearing, [Sloan's expert opinion] doesn't matter." (*Id*. at 259–60.)

For these reasons, the Court rejects Appellee's argument that Sloan's expert testimony was also excludable based on his relationship to Dr. Harris and the trust, but determines that the bankruptcy court did not abuse its discretion in striking Sloan's expert testimony.

## II.   Affirmative Defenses

A bankruptcy court may disallow a creditor's claim for one of nine reasons, the most general of which is if the "claim is unenforceable against the debtor . . . under any agreement or applicable law." 11 U.S.C. § 502(b)(1). A debtor may object to a

creditor's claim under Section 502(b) by asserting any affirmative defense that would be available outside bankruptcy. *Travelers Cas. Ins. Co. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 448 (2007).

In this case, the bankruptcy court determined that Georgia law applies to Appellants' affirmative defenses. (ECF No. 1-1, PageID #62–69; *Harris* ECF No. 242, at 20–27.)  After a thorough choice-of-law analysis, the bankruptcy could concluded that the choice-of-law clause in the loan agreement between Global One and the trust is enforceable. (*Id.*; *Harris* ECF No. 62-2, at 31.)  The Court agrees with this conclusion, and Appellants do not challenge it.  (ECF No. 15, PageID #178–86.) Therefore, the Court will consider Appellants' affirmative defenses under Georgia law.  Fraud and estoppel are affirmative defenses.  Ga. Code Ann. § 9-11-8(c).

### II.A.  Fraudulent Inducement

Appellants argue that the bankruptcy court abused its discretion by "failing to conclude Global committed fraud in inducement." (ECF No. 15, PageID #178.) Appellants' theory of fraudulent inducement relies on the fact that Dr. Harris communicated to Legacy Point and Global One that he did not want to sign a personal guaranty on the loan and their understanding of this position.  (*Id.*, PageID #179–85.) However, Dr. Harris *did* sign the personal guaranty, apparently without reading it. (*Harris*, ECF No. 277, at 134–35.)

Under Georgia law, a party asserting fraudulent inducement must establish that:  (1) there was a false representation; (2) made with scienter; (3) and intent to induce another party to act; (4) which led to justifiable reliance on the representation; and (5) damages. *Stiefel v. Schick*, 398 S.E.2d 194, 195 (Ga. 1990).  "A party who has

'the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of his signature' . . . based on oral representations that differ from the terms of the contract." *Novare Grp., Inc. v. Sarif*, 718 S.E.2d 304, 308 (Ga. 2011).

Legacy Point did not bring the personal guaranty to Dr. Harris's attention. (ECF No. 15, PageID #184–85.)  That failure is insufficient to establish fraudulent inducement for two reasons.  First, Holley, co-owner and manager of Legacy Point, presented Dr. Harris with the loan documents, not Appellee Synovus Bank or its predecessor Global One. (*Harris*, ECF No. 277, at 142.)  Appellants argue that Legacy Point was Appellee's agent.  (ECF No. 15, PageID #197.)  Under Georgia law, agency arises "wherever one person, expressly or by implication, authorizes another to act for him or . . . ratifies the acts of another in his behalf."  Ga. Code Ann. § 10-6-1.  For courts to find an agency relationship, the principal must exert control over the agent. *Aria Dental Grp., LLC v. Farmers Ins. Exch.*, 528 F. Supp. 3d 1359, 1364–65 (M.D. Ga. 2021).

In support of their argument, Appellants point to one email exchange where Global Financial Distributors referred to Legacy Point's Loudon as "our agent."  (ECF No. 277, at 104–08.)   Also, Appellants argue that the commission-sharing arrangement between Legacy Point and Global Financial Distributors supports their position that Loudon was an agent of Appellee.  (ECF No. 15, PageID #198–99; ECF No. 1-1, PageID #49; *Harris* ECF No. 242, at 7.)  Neither of these facts indicate that Global One Distributors exercised control over Loudon.  Moreover, Global Financial

16

Distributors did not offer Legacy Point the commission-sharing arrangement in exchange for control over Loudon and Holley—quite the opposite: Legacy Point shared its commission with Global Financial Distributors. On these facts, the bankruptcy court found that Legacy Point was not Appellee's agent. (ECF No. 1-1, PageID #72; *Harris* ECF No. 242, at 30.) That finding does not constitute clear error. Even if it did, Global One and Global Financial Distributors are separate entities, and Global Financial Distributors is not a party to this proceeding. (*Harris* ECF No. 278, at 19.) Therefore, the record does not support a conclusion that Appellee made a false representation, and Appellants' affirmative defense of fraudulent inducement cannot stand.

Second, Appellants cannot establish justifiable reliance where there is no dispute that Dr. Harris did not read the loan documents in their entirety before signing them. Without question, Dr. Harris refused three iterations of the financing arrangement because he did not want to sign a personal guaranty. (ECF No. 1-1, PageID #49; *Harris* ECF No. 242, at 7; ECF No. 15, PageID #178; ECF No. 17, PageID #221 (adopting the bankruptcy court's findings of fact).) And Global Financial Distributors knew that Dr. Harris did not want to sign a personal guaranty. (*Id.*) But Dr. Harris admitted that he did not read any of the documents before signing them. (*Harris* ECF No. 277, at 144.) On cross examination, Dr. Harris also claimed that he signed the documents in a hurry because he had multiple patients that day. (*Id.* at 134.) Although Dr. Harris might have relied on an understanding on the part of Legacy Point and Global Financial Distributors that he did not want to

17

sign a personal guaranty, nothing prevented Dr. Harris from reading the documents when he signed them. (ECF No. 1-1, PageID #76; *Harris* ECF No. 242, at 34.) Georgia law does not excuse a person from the obligation to read a document before signing where nobody prevented him. *Legacy Acad., Inc. v. Mamilove, LLC*, 771 S.E.2d 868, 870 (Ga. 2015).

Because Dr. Harris lacks a factual basis to support an affirmative defense of fraudulent inducement to Appellee's claim and because nobody prevented from reading the loan documents, the Court affirms the bankruptcy court's ruling on this issue.

### II.B.  Estoppel and Election of Remedies

Appellants argue that the bankruptcy court abused its discretion by "failing to conclude illegal damages, election of remedies and estoppel." (ECF No. 15, PageID #199.)  Consistent with Appellants' original objection, which argued that Appellee's claim was speculative, improper, unliquidated, and premature, the bankruptcy court addressed this argument as one concerning Appellee's claim calculation. (*Harris* ECF No. 55, at 1; ECF No. 1-1, PageID #60–62; *Harris* ECF No. 242, at 18–20.)  Appellants did not identify this argument in their statement of issues on appeal. (*Harris* ECF No. 260.)  However, the bankruptcy court addressed the issue, and the parties briefed it. (ECF No. 1-1, PageID #60–65; *Harris* ECF No. 242, at 18–23; ECF No. 15, PageID #199–201; ECF No. 17, PageID #237–39.) Therefore, the Court will consider it.

In Debtors' Chapter 13 proceeding, Appellee claims $122,338.11. (*Harris* ECF No. 39, at 5.)  That number includes a $71,651.58 loan commitment fee, $16,548.10

in default interest, and $10,151.51 in attorneys' fees.  (ECF No. 1-1, PageID #60; *Harris* ECF No. 242, at 18.)  The loan agreement provides for each of these amounts. (*Harris* ECF No. 62-2, at 27–28 & 31.)  In the event of default, Global One's remedies include the option to "surrender the Insurance Contract(s) to the Insurance Company in exchange for the payment of the cash surrender value thereunder." (*Id.* at 30.)

Estoppel is an affirmative defense in Georgia.  Ga. Code Ann. § 9-11-8(c). Appellants cite no legal authority to support their argument that estoppel applies to Appellee's claim.  (ECF No. 15, PageID #199–201.)  However, the Court interprets their *pro se* filing as arguing that Appellee should be estopped from asserting its claim because of the doctrine of election of remedies.  If a party has more than one remedy, that party may elect among remedies, and their "manifestation of a choice of one of them . . . is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance" on the manifestation. Restatement 2d of Contracts § 378 Election Among Remedies (1981).

Appellee exercised its right under the loan agreement to apply the cash surrender value of the life insurance policy to the loan in the event of default.  Also under the terms of loan agreement, Appellee took lawful action to recover prepayment penalties and interest by suing the trust in federal court in Georgia.  *Synovus*, No. 1:17-cv-02635.  These are not inconsistent remedies, and Appellee is not estopped from exercising its contractual rights under the agreement.  Dr. Harris contacted Global One about altering the terms of the loan to make the payments more affordable, and Appellants argue that Appellee should have altered the terms to avoid

19

the prepayment penalties.  (*Harris*, ECF No. 277, at 138–40; ECF No. 15, PageID #201.)  Appellee could have made those changes—but under the terms of the agreement it was under no obligation to do so, and Appellee never manifested an intent to do so.  Therefore, the Court affirms the bankruptcy court's decision on this issue.

## III.  Appellants' Remaining Arguments

Appellants make three other arguments that are not affirmative defenses under Georgia law—predatory lending, unlicensed solicitation, and breach of fiduciary duty.  Appellants did not identify unlicensed solicitation as an issue in its statement of issues on appeal.  (*Harris* ECF No. 260.)

### III.A. Predatory Lending

Appellants argue that the bankruptcy court erred by failing to conclude that Appellee engaged in predatory lending.  (ECF No. 15, PageID #165.)  Specifically, Appellants claim that Synovus loaned funds to the trust despite knowing that the underwriting form listing Dr. Harris's $7.5 million in "business value" was false and Dr. Harris was not the kind of high net-worth individual for whom this premium financed life insurance policy was appropriate.  (*Id.*)

The bankruptcy court's order does not squarely address Appellants' predatory lending argument.  (ECF No. 1-1; *Harris* ECF No. 242.)  During the evidentiary hearing, the bankruptcy court agreed that it was clear Dr. Harris was not an appropriate customer for this life insurance product.  (ECF No. 1-1, PageID #79; *Harris* ECF No. 242, at 39; *Harris* ECF No. 277, at 259.)  Also during the hearing, the bankruptcy court communicated to Appellants' counsel that predatory lending

was not an affirmative defense to Appellee's claim in the bankruptcy proceeding. (*Harris*, ECF No. 277, at 253–54 (listing proper affirmative defenses).) The bankruptcy court asked Appellants' counsel to identify which predatory lending law Appellee's conduct violated, and he could not do so with any specificity. (*Harris* ECF No. 277, at 254–55.)

Appellants had multiple opportunities to present the legal grounds for their predatory lending argument before the bankruptcy court. They did not. Even applying Ohio law, as Appellants argued the bankruptcy court should, the record does not support Appellants' predatory lending argument. Ohio's consumer protection statutes—the Ohio Predatory Lending Act and the Ohio Consumer Sales Protection Act—apply to consumer loans for residential, personal, family, or household purposes. Ohio Rev. Code § 1349.25(D); Ohio Rev. Code § 1345.01(A). And the Ohio Predatory Lending Act does not provide for private enforcement of the statute's requirements. Ohio Rev. Code § 1349.34(I) (listing remedies available to State and federal regulators). The bankruptcy court did not err by failing to conclude that Appellee engaged in predatory lending. And as the bankruptcy court noted on the record, it is not clear how such a conclusion would invalidate Appellee's claim.

### III.B. Solicitation in Violation of Ohio Law

Appellants argue that the transaction at issue violated Ohio finance licensing laws. Under Ohio law, a person who "engages in the business of entering into or otherwise acquiring premium finance agreements" must acquire a license. Ohio Rev. Code § 1321.73(A). The State can charge criminally those who violate the law and levy fines. Ohio Rev. Code § 1321.99(F). Georgia law applies to the transaction, but

the negotiations and solicitation occurred in Ohio, and the bankruptcy court considered whether Ohio's licensing requirement applied to this transaction. (ECF No. 1-1, PageID #77–78; *Harris* ECF No. 242, at 35–36.) Appellants did not include this argument in their statement of issues on appeal. (*Harris* ECF No. 260.) The bankruptcy court addressed it, and both parties briefed the issue on appeal; therefore, the Court will consider it.

Appellants argue—and Global Financial Distributors seemed to believe—that Ohio's premium financing license requirements applied to this transaction. (ECF No. 15, PageID #194; *Harris* ECF No. 277, at 101 (quoting emails about a "possible solicitation issue").) But the language of the statute is inconsistent with this understanding. Under Section 1321.71(D), a premium finance agreement is one under which "an insured or prospective insured" is the borrower. Ohio Rev. Code § 1321.71(D). The trust, not the insured Dr. Harris, was the borrower here. (ECF No. 1-1, PageID #50; *Harris* ECF No. 242, at 8; *Harris* ECF No. 62-2, at 27.) Under Section 1321.71(C), loans that do not exceed the statutory maximum rate are also exempt from the licensing requirements. Ohio Rev. Code § 1321.71(C). There is no statutory maximum for loans over $100,000. *Id.* § 1342.01(B)(1). The loan at issue, for several million dollars, easily exceeded the $100,000 threshold. (*Harris*, ECF No. 62-2.) The bankruptcy court did not err by concluding that the loan was exempt from Ohio's statutory licensing requirement.

### III.C. Breach of Fiduciary Duty

Appellants argue that the bankruptcy court erred or abused its discretion "in failing to find Synovus breached its fiduciary duty as an insurance agent." (ECF

No. 15, PageID #195.)  Synovus's predecessor Global One was the lender in the transaction, but Appellants argue that the sharing of commission between their insurance agents at Legacy Point and Global Financial Distributors breached a fiduciary duty that Global One owed Appellants.  (*Id.*)  The bankruptcy court did not squarely address this question.

Under Georgia law, a lender does not owe a fiduciary duty to a debtor.  *Webb v. Liberty Mortg.*, No. 1:12-cv-1677, 2012 WL 13014588, at *8 (Dec. 20, 2012 N.D. Ga. Bankr.) (quoting *Phillips v. Atlantic Bank & Trust, Co.*, 309 S.E.2d 813, 815 (Ga. Ct. App. 1983)).  The same rule applies under Ohio law.  *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St. 2d 282, 390 N.E.2d 320, 323 (Ohio 1979) (finding the relationship of debtor and creditor is not a fiduciary relationship, even where the creditor gives "advice and counseling").

Appellants claim that Legacy Point owed them a fiduciary duty as their insurance agents and that an agency relationship existed between Global One and Legacy Point.  (ECF No. 15, PageID #195.)  As discussed above, Appellants cannot point to evidence sufficient to establish that this agency relationship existed.  In an email, an employee of Global Financial Distributors refers to Loudon from Legacy Point as "our agent."  (ECF No. 17, PageID #232.)  The bankruptcy court found that this evidence fell short of proving an agency relationship.  (ECF No. 1-1, PageID #73; *Harris* ECF No. 242, at 31.)  That finding is not clear error.

The Court need not decide whether a fiduciary relationship existed between Appellee and Appellants when Legacy Point acted as Appellee's agent because

Appellants cannot point to evidence sufficient to establish that an agency relationship existed.  Therefore, the bankruptcy court did not err or otherwise abuse its discretion by failing to conclude that Appellee breached a fiduciary duty to Appellants.

## CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the bankruptcy court's decision overruling Appellants' objection to Appellee Synovus Bank's claim and **DENIES** Appellants' request for oral argument.

**SO ORDERED.**

Dated:  December 19, 2022

_____
     J. Philip Calabrese
     United States District Judge
     Northern District of Ohio

24